**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| CITIZENS BANK, N.A., | § | |
| | § | |
| *Plaintiff*, | § | |
| | § | |
| v. | § | Case No. |
| | § | |
| SOFI BANK, N.A., | § | |
| | § | |
| *Defendant*. | § | |

---

**ORIGINAL COMPLAINT AND APPLICATION FOR INJUNCTIVE RELIEF**

---

Plaintiff Citizens Bank, N.A. ("Citizens" or "Plaintiff") files this Original Complaint and Application for Injunctive Relief against Defendant SoFi Bank, N.A. ("SoFi" or "Defendant"):

## I. NATURE OF ACTION

1. SoFi has engaged in a nationwide campaign to target Citizens' mortgage business across multiple states, using deceptive and unfair trade practices to lure key Citizens employees and induce them to breach their contractual, statutory, and common law obligations. The results have been devastating. SoFi has poached key employees of Citizens' mortgage business in Arizona, Minnesota, New York, Pennsylvania, Tennessee, and Virginia. SoFi has also plundered significant portions of Citizens' mortgage business units in Florida and Texas. Here in Connecticut, SoFi has decimated Citizens' mortgage business and essentially eliminated its market presence.

2. Fair competition for valued employees is a cornerstone of the nation's economy. However, inducing individuals to breach contractual prohibitions against employee solicitation and misuse of confidential information in order to steal business and customer relationships crosses the line into unfair competition. SoFi has crossed that line again and again, through its unlawful

poaching of over 30 Citizens employees from its mortgage department, including more than ten employees in the last two months, effectively crippling certain of Citizens' now-depleted branches and substantially damaging its business.

3. SoFi's targeted recruiting and hiring of Citizens employees has gone beyond mere market coincidence, and, instead, is designed to (a) take Citizens' trade secrets and confidential information; (b) induce former Citizens employees to violate their restrictive covenants with Citizens; and (c) induce those Citizens employees to breach their fiduciary duties and duties of loyalty to Citizens.[1] SoFi's choreographed misconduct has broken the law.

4. SoFi's unscrupulous and oppressive actions offend public policy and have caused substantial injury to Citizens, a key competitor. SoFi has engaged in coordinated talent poaching, working with high level Citizens employees and former employees to carry out its scheme. Among other things, SoFi has caused and encouraged these former employees—including entire teams—to (i) breach their agreements and restrictive covenants with Citizens, and (ii) systematically download and abscond with Citizens' client lists, confidential information, and trade secrets. These actions have damaged Citizens' market position and reputation, interfered with Citizens' established relationships, and have threatened to completely eliminate Citizens' presence in the Connecticut mortgage business. Moreover, SoFi has engaged in these actions intentionally and wantonly, and with reckless indifference to Citizens' rights. Rather than build a business unit on its own or engaging in an arm's-length transaction to acquire a valuable business unit that Citizens had built, SoFi has stolen the fruits of Citizens' efforts.

5. Moreover, SoFi's repeated theft of Citizens' trade secrets are RICO predicate acts. As a result, SoFi and its co-conspirators are liable under the federal RICO statute for conducting

[1] Citizens is in the process of commencing arbitrations against certain of these former employees pursuant to binding arbitration agreements.

the affairs of a RICO enterprise through a pattern of racketeering activity (the theft of trade secrets).

6. Citizens seeks permanent injunctive relief against Defendant as well as monetary damages due to SoFi's unfair trade practices, misappropriation of Citizens' trade secrets and confidential information, tortious interference with Citizens' employee contracts, aiding and abetting Citizens employees to breach their duty of loyalty, unfair competition with Citizens, tortious interference with Citizens' business relationships and prospective economic advantage as to its established customers and employees, unjust enrichment, and civil conspiracy.

7. Defendant has improperly and tortiously solicited Citizens employees to leave Citizens and join its ranks, and to do so in a way that violates Citizens' contractual and common law rights. This inducement has resulted in numerous Citizens employees breaching their separate and independent contractual obligations to Citizens, the misappropriation of Citizens' confidential information, and the loss of significant client goodwill and consumer confidence. Critically, Defendant has primarily focused its employee solicitation efforts on Citizens' mortgage lending department, and its efforts have resulted in the loss of significant customer relationships, refinancing opportunities, and referral relationships. Defendant has solicited and hired at least thirty Citizens employees ("Former Employees") to further its unfair competition. SoFi targeted Citizens employees with massive books of business, which are not easily replaceable. To highlight the devastating effect of these departures, the employees recently poached from Citizens' Connecticut branch were accountable for over $400 million in closed loans that generated approximately $5 million in revenue in the year leading up to SoFi's unlawful raid.

8. This action is necessitated as a result of SoFi's recent decimation of Citizens' Connecticut mortgage lending department, furthering SoFi's well-honed scheme to raid Citizens

employees and customers and misappropriate Citizens' confidential and proprietary information.

9. Indeed, on June 12, 2026, SoFi strategically orchestrated the coordinated resignations of nine employees from Citizens' Connecticut office. This coordinated targeting was designed to cause maximum disruption to Citizens' Connecticut office and mortgage department.

10. SoFi's predatory raiding has continued. Since the Connecticut raid, Citizens has lost three additional employees from its mortgage department to SoFi.

11. Through forensic analysis, Citizens has learned that its Former Employees accessed and misappropriated Citizens' confidential information at or near the times of their resignations, in gross violation of numerous state and federal privacy laws, including detailed customer lists containing clients' names, contact information, account numbers, loan amounts, loan rates, transaction types, loan products, loan funding dates, and customer credit details, as well as referral databases, pricing models, loan pipelines and refinancing information, and then transferred this information. Citizens' highly confidential and trade secret information is now unlawfully in SoFi's possession and being used to unfairly compete against Citizens. Moreover, SoFi encouraged, incentivized, and orchestrated this misappropriation of Citizens' trade secret information.

12. The above actions are consistent with SoFi's well-established *modus operandi* to grow its business not through lawful, legitimate means, but by an unlawful corporate raid designed to cripple competition. SoFi has infiltrated Citizens' mortgage division, secured the departure of key Former Employees, and encouraged these Former Employees to solicit the resignations of other Citizens employees in violation of their restrictive covenants with Citizens. Upon information and belief, SoFi has instructed the Former Employees to take Citizens' trade secrets and use them to steal customers and business. SoFi is certainly aware that this causes the Former Employees to breach their restrictive covenants and other duties to Citizens—it just does not care.

13. SoFi must be stopped immediately. Citizens seeks permanent injunctive relief to prevent SoFi from continuing to inflict irreparable harm on Citizens by: (i) impairing Citizens' goodwill and reputation with its customers and referral sources, (ii) destroying Citizens' customer, referral, and employee relationships, (iii) disrupting the continuity of Citizens' workforce, (iv) threatening the continued disclosures, misuse, and misappropriation of Citizens' confidential and trade secret information, including legally protected consumer information, and (v) threatening to cause the destruction and total loss of Citizens' mortgage business in this state. Unchecked, SoFi will continue building its business by unlawfully raiding Citizens' trade secrets, employees, and customers, stealing for itself the business that Citizens spent years and untold dollars developing.

14. SoFi presents a serious threat to Citizens' customer relationships and goodwill, key employees, and valuable confidential information and trade secrets and it must be stopped. To prevent continued irreparable harm arising from SoFi's misconduct, Citizens seeks permanent injunctive relief.

## II. JURISDICTION AND VENUE

15. This Court has jurisdiction in this action pursuant to 28 U.S.C. § 1332(a) in that, as alleged below, Plaintiff Citizens and SoFi are citizens of different states, and the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs. This Court also has original jurisdiction over this action pursuant to the provisions of 28 U.S.C. § 1331 in that this matter is a civil action arising under the Constitution, laws, or treaties of the United States. This action is based on 18 U.S.C. §§ 1836 *et seq.*, also known as the Defend Trade Secrets Act (the "DTSA") and 18 U.S.C. § 1964. Additionally, this Court has supplemental jurisdiction over Plaintiff's state law and other claims pursuant to 28 U.S.C. § 1367.

16. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391, in that a substantial part of the events giving rise to the claims occurred in this district.

## III. THE PARTIES

17. Plaintiff Citizens Bank, N.A. is a national banking association with its principal place of business and main office in Rhode Island and is a citizen of Rhode Island.

18. Defendant SoFi Bank, N.A. is a national banking association with its principal place of business and main office in Cottonwood Heights, Utah and is a citizen of Utah. Upon information and belief, SoFi does not have any brick-and-mortar locations in this state, but it does significant business in the State of Connecticut and conducts significant targeted advertisements in Connecticut. SoFi has a website link dedicated to mortgage rates in Connecticut which invites users to view their rates, call for a complimentary mortgage consultation, and to log in and transact within accounts.[2] Similarly, SoFi has a website link regarding Small Business Loans in Connecticut which invites individuals to search for financing and to log in and transact with accounts.[3] Additionally, as evidenced below, SoFi hires employees in Connecticut through whom it provides mortgage services in Connecticut.

## IV. FACTS COMMON TO ALL CAUSES OF ACTION

### A. Citizens expends considerable resources on its employees and aggressively and diligently protects its trade secrets and confidential information and the customer relationships it has developed.

19. Plaintiff Citizens Bank, N.A. is a subsidiary of Citizens Financial Group, Inc., which is one of the oldest and largest financial institutions in the nation. Citizens offers personal, small business, and commercial banking services. Among its services, Citizens is in the business of making home mortgage, home equity, and personal loans. Citizens employs managers, analysts, loan officers, loan officer assistants, and consultants to assist with its mortgage services.

---

[2] https://www.sofi.com/mortgage-rates-in-connecticut/.
[3] https://www.sofi.com/small-business-loans/small-business-loans-connecticut/

20. Citizens spends substantial resources training all employees on its proprietary business models, selling techniques, and specialized strategies and services. Further, Citizens spends substantial resources in terms of time, effort and money annually to provide programs and support to its employees, including its employees who work in or assist with its home mortgage division, for them to use to obtain and build relationships with its customers. Citizens' customer lists and customer relationships are the lifeblood of its business, and the expenditures incurred by Citizens in obtaining and maintaining its customers include the millions of dollars spent by Citizens every year on advertising and marketing, training employees, and the many other expenditures Citizens incurs in maintaining its goodwill in the industry.

21. To protect itself from unfair competition, Citizens makes substantial efforts to ensure the confidentiality of information concerning its customers and strategies. Citizens requires its employees to abide by employee policies and procedures that specifically treat customer and proprietary information as Citizens' property and that prohibit the use or disclosure of this information other than in connection with Citizens' business. These policies are incorporated into Citizens' contractual agreements with its employees. Also protected are Citizens' pricing margins, consumer agreements, loan pipelines, and account information. The customer and proprietary information protected by Citizens includes data supplied by borrowers, such as clients' names, contact information, social security numbers, bank account numbers, customer assets, customer liabilities, loan approval, loan status and loan denial, credit scores, account balances, and similar information. It also includes loan amounts, loan rates, transaction types, loan products, and loan funding dates. This information is protected and prohibited from disclosure to third parties by laws including but not limited to the Gramm-Leach-Bliley Act, 15 U.S.C. §§ 6801–6809.

22. Moreover, Citizens maintains policies safeguarding customer and proprietary information to protect customers' privacy interests and keeps this information strictly internal so that it does not fall into the hands of competitors. These policies prohibit providing customer and proprietary information to any third party or otherwise removing this information from Citizens. Disclosure of Citizens' customers and proprietary information to competitors would give those competitors an unfair advantage in soliciting Citizens' clients.

23. Citizens exerts significant efforts to maintain the secrecy and confidentiality of its client records, including information identifying its customers. Its offices are locked and secure during non-working hours and security firms monitor its buildings. The computer system is password-protected, and only authorized Citizens' personnel have access to confidential customer and loan information. The highly sensitive and confidential customer information that Citizens is required to maintain is kept secure on the Citizens network. Citizens employees are undoubtedly aware of the steps taken by Citizens to protect its client and proprietary information.

24. Citizens derives actual and potential economic value from its client and proprietary information in part because this information is not generally known to, and not ascertainable through proper means by, other persons who can obtain economic value from its disclosure or use. Citizens goes to great lengths and incurs significant expense to maintain and grow its mortgage customers and referral network, establish customer relationships and trust, and acquire/develop the confidential information it seeks to protect. These efforts include marketing, training its employees, conducting extensive research and due diligence, and providing services that best fit the mortgage needs of its customers, all of which take time and money to accomplish. Citizens' competitors, including SoFi, recognize the value of such information and, upon information and belief, similarly take appropriate steps to protect it. Should a competitor improperly gain access

to and use of Citizens' confidential information, it would be unjustly enriched. At the same time, Citizens would be harmed by unfair competition and the devaluing of its confidential information through the loss of its confidentiality.

**B. Citizens and SoFi are competitors.**

25. Defendant SoFi Bank, N.A. is a subsidiary of Social Finance, Inc. and is a virtual bank operating without any physical branches. Like Plaintiff, Defendant offers a range of banking services which include providing home mortgage, home equity, and personal loans. As mortgage lenders, SoFi and Citizens strive for market share by offering competing home loans and refinancing products to customers.

26. In Connecticut, both Citizens and SoFi are engaged in the advertising, offering, and provision of financial services (including and mortgage lending services). Both Citizens and SoFi also engage in banking, brokerage, and other financial services activities in Connecticut and nationwide.

**C. The Former Employees' Employment with Citizens.**

27. On or around March 2018, Citizens hired Eric Schuppenhauer ("Schuppenhauer") as an Executive Vice President and Head of Consumer Lending in Dallas, Texas. Upon his hiring, Schuppenhauer executed an offer letter with Citizens. As head of consumer lending, Schuppenhauer led all aspects of Citizens' consumer lending product groups including mortgage, home equity, auto, student, credit card, and unsecured products.

28. On or around March 19, 2018, Citizens hired Kevin Lowry ("Lowry") as a remote Senior Project Analyst in Texas as part of its consumer lending administration division. Upon his hiring, Lowry executed an offer letter with Citizens.

29. On or around August 1, 2018, Citizens hired Lauren French ("French") as a Marketing Manager in Franklin, Tennessee as part of its home mortgage division. Upon her hiring, French executed an offer letter with Citizens.

30. On or around September 24, 2018, Citizens hired Daniel McDonald ("McDonald") as a remote Senior Strategy Manager in Texas as part of its administrative support division. Upon his hiring, McDonald executed an offer letter with Citizens.

31. On or around March 4, 2019, Citizens hired Emily Scheuer ("Scheuer") as a remote Home Mortgage Loan Officer Assistant in New York as part of its home mortgage division. Upon her hiring, Scheuer executed an offer letter with Citizens. *See* **Exhibit 1**.

32. On or around October 21, 2019, Citizens hired Connecticut employees Kimberly Weintraub ("Weintraub"), Michael Daversa ("Daversa"), William Man ("Man"), and Barbara Karosy ("Karosy"). Weintraub and Man were hired as Mortgage Loan Officers, Daversa was hired as a Mortgage Market Manager, and Karosy was hired as a Home Loan Office Assistant. Each of these employees were part of Citizens' home mortgage division. Daversa led a Connecticut team consisting of Man, Weintraub, and Karosy (the "Daversa Team").[4] Weintraub and Daversa worked for Citizens at its Westport, Connecticut location and Man and Karosy worked for Citizens remotely in Connecticut. Upon their hiring, they each executed an offer letter with Citizens. *See* **Exhibits 2, 3, 4, and 5**.

33. On or around February 3, 2020, Citizens hired Peggy Johns ("Johns") as a Senior Program Manager in Plano, Texas as part of its home mortgage division. Upon her hiring, Johns signed an offer letter with Citizens. *See* **Exhibit 6**.

---

[4] The Daversa Team eventually included eight members, all of whom were solicited to breach their Agreements by SoFi.

34. On or around March 9, 2020, Citizens hired Betty Marceaux ("Marceaux") as a Business Support Manager in Plano, Texas. A few days later, on or around March 16, 2020, Citizens hired Lewis Tong ("Tong") as Head of Consumer Direct Sales in Irving, Texas. Shortly thereafter, on March 23, 2020, Citizens hired Elizabeth Hammond ("Hammond") as a Home Mortgage Consumer Direct Loan Officer in Irving, Texas. Upon their hiring Marceaux, Tong, and Hammond each executed an offer letter with Citizens. *See* **Exhibits 7, 8, and 9**.

35. On or around May 11, 2020, Citizens hired Jared Newton ("Newton") as a remote Business Insights Manager in Texas as part of its home mortgage division. Upon his hiring, Newton executed an offer letter with Citizens. *See* **Exhibit 10**.

36. On or around June 8, 2020, Citizens hired Alexandra Lyles ("Lyles") as a remote Business Insights Senior Analyst in Texas as part of its home mortgage division. Upon her hiring, Lyles executed an offer letter with Citizens. *See* **Exhibit 11**.

37. On or around September 14, 2020, Citizens hired Adam Allgood ("Allgood") as a Home Mortgage Consumer Direct Sales Manager in Plano, Texas as part of its home mortgage division. Upon his hiring, Allgood executed an offer letter with Citizens. *See* **Exhibit 12**.

38. On or around January 19, 2021, Citizens hired Christopher Capes ("Capes") as a remote Business Support Consultant in Minnesota as part of its home mortgage division. Upon his hiring, Capes executed an offer letter with Citizens. *See* **Exhibit 13**.

39. On or around April 9, 2021, Citizens hired Michael Ordille ("Ordille") as a Home Mortgage Area Sales Manager in Florida. Upon his hiring, Ordille executed an offer letter with Citizens. *See* **Exhibit 14**. As an area sales manager, Ordille directed a team of producing sales managers and loan officers to achieve regional sales, service, and Community Reinvestment Act goals. Ordille's focus was to recruit, coach, and expand Citizens' market share in mortgages.

40. On or around February 14, 2022, Citizens hired Dwight Miller ("Miller") as a remote Home Mortgage Direct Loan Officer in Florida as part of its home mortgage division. Upon his hiring, Miller executed an offer letter with Citizens. *See* **Exhibit 15**.

41. On or around April 11, 2022, Citizens hired Tyler Armstrong ("Armstrong") as a Mortgage Loan Officer in West Hartford, Connecticut as part of its home mortgage division. Upon his hiring, Armstrong executed an offer letter with Citizens. *See* **Exhibit 16**. On or around July 25, 2022, Citizens hired James Carr ("Carr") as a remote Mortgage Loan Officer in Connecticut as part of its home mortgage division. Upon his hiring, Carr executed an offer letter with Citizens. *See* **Exhibit 17**. During their employment with Citizens, Armstrong and Carr's manager was Daversa and they worked with the rest of his Connecticut team.[5]

42. On or around March 20, 2023, Citizens hired John Jones ("Jones") as a Mortgage Market Manager in Tysons, Virginia as part of its home mortgage division. Upon his hiring, Jones executed an offer letter with Citizens. *See* **Exhibit 18**.

43. On or around April 24, 2023, Citizens hired Richard Casiello ("Casiello") as a remote Business Insights Senior Analyst in Arizona as part of its home mortgage division. Upon his hiring, Casiello executed an offer letter with Citizens. *See* **Exhibit 19**.

44. On or around September 29, 2023, Citizens hired Michael Brown ("Brown") as a remote Mortgage Loan Officer in Connecticut as part of its home mortgage division. Upon his hiring, Brown executed an offer letter with Citizens. *See* **Exhibit 20**. During his employment at Citizens, Brown's manager was Daversa, and he worked with the rest of Daversa's Connecticut team.[6]

---

[5] The Daversa Team includes Carr and Armstrong.

[6] The Daversa Team includes Brown.

45. On or around October 10, 2023, Citizens hired Ryan Obermeier ("Obermeier") as a remote Mortgage Loan Officer in Virginia as part of its home mortgage division. Upon his hiring, Obermeier executed an offer letter with Citizens. *See* **Exhibit 21**.

46. On or around March 22, 2024, Citizens hired Scott Rubin ("Rubin") as a Mortgage Loan Officer as part of its home mortgage division reporting to Ordille. Rubin worked for Citizens remotely in Florida. Upon his hiring, Rubin executed an offer letter with Citizens. *See* **Exhibit 22**.

47. On or around December 9, 2024, Citizens hired Andrew Sherlock ("Sherlock") and Donald Dill ("Dill") as Home Mortgage Consumer Direct Loan Officers as part of its home mortgage division. Sherlock worked for Citizens remotely in Pennsylvania and Dill worked for Citizens in Plano, Texas. Upon their hiring, Sherlock and Dill each signed offer letters with Citizens. *See* **Exhibits 23 and 24**.

48. On or around March 31, 2025, Citizens hired Rachel Alexander ("Alexander") as a Mortgage Loan Officer in West Palm Beach, Florida as part of its home mortgage division. Upon her hiring, Alexander executed an offer letter with Citizens. *See* **Exhibit 25**.

49. On or around July 28, 2025, Citizens hired Paul Menga ("Menga") as a remote Mortgage Loan Officer in Connecticut as part of its home mortgage division. Upon his hiring, Menga executed an offer letter with Citizens. *See* **Exhibit 26**. During his employment with Citizens, Menga's manager was Daversa, and he worked with Daversa's Connecticut team.[7]

**D. The Former Employees' Employment Agreements with Citizens.**

50. The thirty Former Employees, Lowry, McDonald, Johns, Tong, Allgood, Hammond, Miller, Sherlock, Dill, Capes, Newton, French, Marceaux, Lyles, Casiello, Alexander,

---

[7] The Daversa Team includes Menga.

Scheuer, Weintraub, Daversa, Man, Karosy, Armstrong, Carr, Brown, Menga, Jones, Obermeier, Ordille, Schuppenhauer, and Rubin were provided with years of training, customer and referral source introductions and leads, access to Citizens' confidential and trade secret information, and thousands of dollars in expense reimbursements. They were also handsomely compensated for their work. In return, the Former Employees entered into agreements[8] with Citizens that include certain narrow covenants that governed their conduct during, and governed or govern their conduct after, their employment. Upon the commencement of their employment, each of the Former Employees signed and agreed to abide by the terms set forth in Citizens' Offer Letter and attached Addendum, which explicitly incorporated Citizens' corporate policies[9] (collectively, the "Agreements"). The Agreements contained customer and employee non-solicitation clauses and confidentiality provisions.

51. The Agreements' non-solicitation clauses set forth in Exhibits 1–26 vary slightly in wording but nonetheless bound each Former Employee from directly or indirectly soliciting or inducing any Citizens employee to terminate his or her employment or accept employment with any other entity. The Agreements also contained covenants prohibiting the Former Employees from soliciting Citizens' customers to discontinue or diminish their relationships with Citizens. For all but two of the Former Employees, the non-solicitation period extended for 365 days after the termination of the Former Employees' employment with Citizens. *See* Exhibits 2–4; 6–26. Karosy's and Scheuer's non-solicitation period is 180 days. *See* Exhibits 5 and 1, respectively.

52. The non-solicitation clauses contained in the Agreements, state:

> During your employment and for a period of 365 days following the

[8] *See* Exhibits 1-26.

[9] *See* Citizens Financial Group, Inc. Code of Business Conduct and Ethics, attached hereto as **Exhibit 27**; *see also* Citizens Client Management and Information Barrier Policy, attached hereto as **Exhibit 28**; Citizens Privacy Policy Privacy Minimum Requirements, attached hereto as **Exhibit 29**; Citizens Cybersecurity Policy, attached hereto as **Exhibit 30**.

> termination of employment for any reason, you will not directly or indirectly solicit (through any person, corporation, partnership or other business entity of any kind), *hire*, recruit, induce, entice, influence, encourage, or assist in soliciting or hiring, any person who is employed during such period by Citizens or its affiliates; nor will you directly or indirectly induce any such person to: (a) terminate his or her employment or (b) accept employment with anyone other than Citizens or its affiliates.
>
> During your employment, including your Notice period (as fully defined below), and for a period of 365 days following the termination of employment for any reason, you will not directly or indirectly (through any corporation, partnership or other business entity of any kind) solicit, assist in soliciting for business or entice away or in any manner attempt to persuade any client or customer or prospective client or customer to discontinue or diminish his, her or its relationship or prospective relationship with Citizens or its affiliates, or otherwise accept from and/or provide business to any person, corporation, partnership or other business entity of any kind other than Citizens or its affiliates. The restrictions in this paragraph will apply only: (1) to clients, customers or prospective clients or customers introduced to you by Citizens or its affiliates; or (2) any customer of Citizens or its affiliates (whether introduced to you through Citizens or its affiliates, or previously known to you) with whom you have contact during your employment by Citizens or any affiliate (including your Notice Period); or (3) any customer or client of Citizens or its affiliates whose identity or potential client became known to you as a result of your employment at Citizens or its affiliates.

*See, e.g.,* Exhibits 2, 3, and 4.[10]

53. In addition, when executing the Agreements, each of the Former Employees agreed to adhere to Citizens' strict confidentiality requirements set forth in several Citizens' policies, including its Code of Business Conduct and Ethics. *See* Exhibit 27. These policies explicitly prohibit the disclosure or removal of Citizens' confidential information. Specifically,

> All corporate, customer, director, colleague and supplier information (other than information that is public knowledge as a result of authorized disclosure) is considered to be confidential, privileged and proprietary to CFG at all times during or following an individual's employment or affiliation with CFG. Confidential proprietary information generated and gathered in our business is a valuable company asset. Protecting this information plays a vital role in our continued growth and ability to

[10] The remainder of the Agreements are almost identical, with the exception of the italicized term "hire".

compete, all proprietary information must be maintained in strict confidence, and disclosure to unauthorized persons is prohibited except when disclosure is authorized by CFG or required by law. Except for information that is protected from disclosure by any applicable law or legal privilege, colleagues are permitted to communicate or cooperate with any federal, state, or local government agency or commission with applicable jurisdiction about a good faith complaint of illegal activity.

Proprietary information includes all non-public information that might be useful to competitors or that could be harmful to CFG, its customers or its suppliers if disclosed. Intellectual property, such as trade secrets, patents, trademarks and copyrights as well as business, research and new product plans, objectives and strategies, records, databases, colleague medical information, customer and colleague personal information (including Social Security numbers, passwords, personal identification numbers and electronic access keys), suppliers lists and any unpublished financial or pricing information must also be protected.

Unauthorized use, access or distribution of proprietary information violates CFG policy and may be illegal. Such use or distribution could result in negative consequences for both CFG and the individuals involved, including potential legal and corrective actions. We respect the property rights of other companies and their proprietary information, and you are required to observe such rights. Without exception, customer and bank information should be accessed on a need-to-know only basis.

Your obligation to protect CFG's proprietary and confidential information continues even after you leave CFG, and you must return all proprietary information in your possession upon leaving CFG.[11]

54. Similarly, Citizens' Cybersecurity Policy confirms:

Citizens Financial Group, Inc. and each of its subsidiaries (collectively Citizens) processes, transmits and/or stores highly sensitive and valuable information relating to its business operations, its employees and its customers. This information is one of Citizens' most important business assets, and it is vital that this information be protected at all times from unauthorized use, loss, theft, or any other improper disclosure. Certain information is protected by applicable state and federal law and is subject to contractual obligations that restrict its use or disclosure. Citizens, its employees, and its third-party service providers must comply with these obligations and ensure that this information remains protected as appropriate for its level of sensitivity. If this information is exposed to unauthorized individuals or misused by authorized individuals (insider

[11] Exhibit 27.

> threat), it could cause significant reputational harm to Citizens, impact Citizens' ability to do business, and subject Citizens and/or its employees to various fines and penalties, as well as potential criminal liability.[12]

55. The confidentiality provisions comport with the provisions of 15 U.S.C. §§ 6801–6809, which govern the treatment of confidential, nonpublic information of consumers by financial institutions, along with comparable state laws and regulations governing consumer privacy.

**E. SoFi targets Citizens employees and confidential information.**

56. SoFi's targeted solicitation of Citizens employees commenced in or around August 2024 when it convinced Citizens' Executive Vice President and Head of Consumer Lending, Schuppenhauer, to breach his employment agreement with Citizens. Upon his resignation, Schuppenhauer began his employment with SoFi in the same role he had at Citizens, Executive Vice President and Group Business Unit Leader for SoFi's consumer lending department. Essentially, Schuppenhauer moved from head of borrowing at Citizens to head of borrowing at its competitor at SoFi. Upon information and belief, SoFi induced and/or incentivized Schuppenhauer to breach his non-solicitation provisions and commenced its targeted raid of Citizens' employees and customers.

57. Indeed, subsequent to SoFi's hiring of Schuppenhauer, SoFi unlawfully solicited and hired eleven more employees from Citizens' Texas mortgage department, effectively handicapping Citizens' ability to operate its mortgage department in the southwest region. SoFi convinced the Former Employees to unlawfully breach their contractual obligations to Citizens by soliciting other Texas employees and Citizens' customers. Upon information and belief, SoFi also induced the Former Employees to share Citizens' confidential information and business

---

[12] Exhibit 30.

relationships with SoFi. SoFi's targeted solicitation efforts led to the coordinated resignation of the Former Employees and their respective breaches of their employment agreements.

58. Within days of Schuppenhauer's resignation, Lowry resigned from Citizens on August 23, 2024, and took a nearly identical role at SoFi.

59. Shortly after Lowry's resignation, SoFi solicited two other employees from Citizens' Texas office. McDonald and Johns resigned from Citizens on December 9, 2024, and December 13, 2024, respectively. These Former Employees also assumed nearly identical roles at SoFi.

60. Approximately two months later, SoFi orchestrated the resignations of six Citizens mortgage department employees over the span of two days. Indeed, SoFi solicited Citizens employee and key manager Tong to resign from Citizens on February 14, 2025. Tong led a team of employees comprised of Marceaux, Hammond, and Allgood (the "Tong Team"). SoFi encouraged Tong to breach his contractual obligations to Citizens, and he immediately solicited Allgood to join him at SoFi. Tong is now SoFi's National Sales Director and Allgood is a Sales Leader for SoFi.

61. Four days later, on February 18, 2025, SoFi induced Tong to again breach his restrictive covenant with Citizens and hire Hammond, another member of the Tong Team, to leave his position at Citizens for a nearly identical one at SoFi.

62. That same day, SoFi continued its unlawful raid of experienced and knowledgeable Citizens employees and solicited another Citizens Texas employee, Dill, to leave Citizens and join SoFi as a Loan Officer.

63. SoFi also orchestrated the February 18, 2025, resignations of Miller and Sherlock, who immediately joined SoFi as Loan Officers.

64. Apparently, unsatisfied with its poaching of ten Citizens employees, SoFi advanced its efforts to unfairly compete with Citizens by inducing additional key Citizens employees to breach their Agreements with Citizens. SoFi continued its targeted raid on Citizens employees and placed each hire into the same competitive positions where their knowledge of Citizens' confidential information would be used to SoFi's advantage.

65. Within days of each other, SoFi orchestrated the resignations of two more Citizens employees. SoFi poached Capes from Citizens on September 2, 2025. He was hired to work at SoFi in a similar position as a Mortgage Compliance Analyst.

66. SoFi again induced Citizens' Former Employees to breach their contractual non-solicitation obligations when it hired another employee from Citizens' Texas branch, Newton, on September 5, 2025. Newton took a similar position as a Senior Strategy & Analytics Manager in home lending.

67. Approximately a month later, on October 17, 2025, SoFi solicited French to join SoFi as a Senior Staff Enablement Specialist.

68. Less than two months later, SoFi completed its decimation of Citizens' Texas Tong Team on December 5, 2025, by soliciting the last remaining member, Marceaux, to join it as a Mortgage Compliance Analyst.

69. SoFi's solicitation of Newton, French, and Marceaux was particularly damaging as they all held managerial roles in Citizens' home mortgage division.

70. SoFi then resumed its poaching efforts on Citizens' Florida branch and solicited another Citizens' manager, Ordille, to breach his Agreement with Citizens. Ordille resigned in March of 2026 and began his role as National Retail Mortgage Sales Director for SoFi.

71. Shortly thereafter, SoFi solicited two more senior analysts from Citizens' home mortgage division. Lyles resigned from her position with Citizens' Texas mortgage branch on March 20, 2026. Casiello resigned from Citizens' Arizona mortgage branch two weeks later, on April 3, 2026.

72. Six days after Casiello's resignation, on April 9, 2026, SoFi convinced Ordille to breach his employee non-solicitation contractual provision when it hired his Florida team member, Alexander, to breach her Agreement with Citizens and join SoFi as a Retail Mortgage Loan Originator.

### F. SoFi advances its raid of Citizens employees and orchestrates the coordinated resignations of a nine-member Connecticut team and the removal of significant amounts of Citizens' confidential information.

73. In June of 2026, SoFi strategically orchestrated the coordinated resignations of nine Citizens employees from its Connecticut branch, effectively annihilating this branch. Indeed, the entire Connecticut Daversa Team resigned on June 12, 2026.[13] *See* **Exhibit 31**, Daversa's resignation.

74. At the time of his resignation, team leader, Daversa claimed, "he had no idea," if any other employees were departing with him. **However, within a time span of 49 minutes, in a highly orchestrated manner, six other members of the Daversa Team resigned**. *See* **Exhibit 32**; **Exhibit 33**; **Exhibit 34**; **Exhibit 35**; **Exhibit 36**; and **Exhibit 37**. Two other members of Daversa's team also resigned that day. *See* **Exhibit 38** and **Exhibit 39**. Unbeknownst to Citizens, the *en masse* departure was coordinated by SoFi long before the resignations took place and was part of a scheme to steal Citizens' confidential and trade secret information, employees, and customers.

---

[13] The Daversa Team included Daversa, Weintraub, Carr, Brown, Menga, Karosy, Armstrong, Man, and Scheuer.

75. Upon investigation, Citizens learned that Daversa has contacted multiple Citizens employees on behalf of SoFi touting its ability to "expand" his business and "get ahead of the pack". *See, e.g.,* **Exhibit 40**. Tellingly, Daversa also confirmed that at SoFi he would "work with familiar faces". *Id.*

76. Daversa resigned from his role at Citizens as a Mortgage Market Manager and began a nearly identical role as a Mortgage Market Leader at SoFi. Weintraub, Armstrong, Carr, Brown, Man, and Menga were all mortgage loan officers at Citizens and took similar positions at SoFi upon their resignations. At SoFi, Weintraub began a position as a Mortgage Coach and Senior Loan Specialist. Carr and Armstrong became Loan Lending Specialists at SoFi. Man, Brown, and Menga became Senior Mortgage Loan Officers at SoFi after their resignations from Citizens. Karosy also assumed a nearly identical role at SoFi within its home lending division.

77. Upon information and belief, at the instruction of SoFi, members of the Daversa team misappropriated Citizens' proprietary and confidential information in order to share it and use it at SoFi for the purpose of unfairly competing with Citizens.

78. Indeed, Citizens has discovered that in the months prior to his departure, Daversa sent screen shots of four separate client lists to his personal email address. *See* **Exhibit 41**. The email entitled "Refinance Opportunities" contained four PDF documents which were screen shots of Citizens' confidential client information—information subject to reasonable protection efforts detailed *supra*. The PDF documents were titled "MD Client List 1," "MD Client List 2," "MD Client List 3," and "MD Client List 4". *See id.* Each one of these lists contained vast amounts of Citizens' confidential client information including clients' names, contact information, loan amounts, loan rates, transaction types, loan products, loan funding dates, and clients' credit scores. These lists detail refinancing opportunities for hundreds of Citizens' clients. There was no

legitimate business purpose for Daversa to send this confidential information to his personal email address. It is evident he colluded with SoFi to obtain this information in order to divert business from Citizens and to solicit Citizens' customers to refinance their loans with SoFi instead of Citizens. Indeed, Daversa states his intent to "pounce" on these clients at a later date. *Id*. This proprietary information should not be in SoFi's possession.

79. Similarly, Man sent emails from his Citizens' email address to his personal email address which also contained Citizens' confidential client information and proprietary information. On May 15, 2026, Man emailed himself an excel sheet titled "William-Man-Jan-Oct-2025" which contains a list of dozens of Citizens' customer loans funded during 2025. This list contains Citizens' confidential and proprietary information including customer names and detailed information regarding their loans. *See* **Exhibit 42**. The proprietary information that is now in SoFi's hands includes loan funding dates, product codes, coupon codes, product descriptions, loan amounts, original and revised basis points, and gross commissions earned on each loan. *See id*. There was no legitimate business purpose for Man to send this confidential information to his personal email address. Indeed, this information has independent value to Citizens in part due to its secrecy, and Citizens protects this information. Competitors like SoFi can use this information to further improperly target Citizens' business and potential business, and to poach Citizens' business opportunities unfairly.

80. On June 9, 2026, three days prior to the Daversa Team's mass exodus to SoFi, Man sent additional client contact information to his personal email. *See* **Exhibit 43**. The email contained two spreadsheets titled "bounced emails 3.12.22," and "Final Updated Contact List." *See id*. The former list that the Daversa Team absconded with contains contact information for over a hundred Citizens clients including email addresses and client phone

numbers. *See id*. The latter spreadsheet contains several sheets titled: “clients”, “to add or correct from willie”, “agents”, “bounced emails”, and “from willie text”. The “clients” sheet contains Citizens’ client names and contact information. *See id*. The “to add or correct from willie” sheet contains client names, contact information, and some locations. *See id*. The “agents” sheet contains a list of Citizens’ referral sources including real estate agents and their respective contact information. *See id*. The “bounced emails” sheet appears to incorporate a cleaner version of the “bounced emails 3.12.22” spreadsheet. *See id*. The “from willie text” spreadsheet contains additional real estate agent referral information along with the company, contact information and a “note from willie.” *See id*. The “note from willie” contains notes which instruct Man to add to the contact information to “work email,” or “add to mailchimp” or to delete the emails and add to new ones. *See id*.

81. On the day of the Daversa Team resignation, Scheuer emailed Man using their Citizens’ addresses an excel spreadsheet titled “Daily Pipe 6.12.2026.” *See* **Exhibit 44**. This excel spreadsheet contains the account numbers and names of Citizens’ customers with loans in process. *See id*. It also contains dozens of columns of detailed loan information, product descriptions, loan amounts, product codes, and borrower information. *See id*. There was no legitimate business reason for Scheuer to provide Man a list of all loans in process given that the Team resigned moments later. Man then printed this confidential Citizens’ spreadsheet and took it with him upon his departure from Citizens. Notably, although Man had previously received such spreadsheets, there is no record of him previously printing these documents. There was no legitimate business reason for Man to print this confidential Citizens’ information on the day of his departure and abscond with it. It is clear that Citizens’ highly confidential information is now in SoFi’s possession, as Man, now an employee of SoFi, took it with him on his departure.

82. Additionally, on June 8, 2026, four days before his move to SoFi, Armstrong attempted to upload to his personal iCloud a Citizens' spreadsheet containing vast amounts of Citizens' confidential client information including client names, birthdates, social security numbers, and referral sources. The spreadsheet was titled "Xmas family labels," and contained three sheets titled, Clients, Realtors, and Other. *See* **Exhibit 45**. The "Clients" spreadsheet contained client names, contact information, some dates of birth and social security numbers. The "Realtors," sheet contained realtor names, contact information, and some numbers in the date of birth column that more correspond to social security numbers. The "Other," sheet contained the names of three attorneys with two in Farmington, Connecticut.

83. Citizens sent the Daversa Team cease and desist letters reminding them of their post-employment obligations to Citizens. *See* Exhibits 1, 2, 3, 4, 5, 16, 17, 20, and 26.

84. At the time it sent these letters, Citizens was not aware of the vast scope of the above-referenced misappropriations and misconduct.

85. Concerningly, Citizens has not received a response from any Daversa Team members or SoFi. This is alarming, given the extensive proof of SoFi's misappropriation of Citizens' confidential and proprietary information and its clear coordinated effort to unfairly compete in the mortgage market.

86. The volume of Citizens' Former Employee hires, coupled with the numerous breaches of the Former Employees Agreements, and the misappropriation of a significant amount of Citizens' confidential information indicates that SoFi's organized scheme was willful and malicious. The effect of SoFi's raiding scheme has resulted in the loss of Citizens' confidential information, its employees, its goodwill, and its clients.

87. SoFi's raid of Citizens' Connecticut mortgage department was particularly devastating as SoFi took vast amounts of Citizens' confidential and proprietary information and 70% of Connecticut's producers who were responsible for closing over 80% of Citizens' Connecticut mortgages during the preceding year.

**G. SoFi continues to solicit Citizens employees and induce them to breach their contracts and misappropriate Citizens' confidential information.**

88. Emboldened by its brazen raid of Citizens' Connecticut office, SoFi has continued its unlawful scheme and has acquired more Citizens' confidential information and solicited four additional Citizens employees. A mere ten days after the Connecticut exodus, on June 22, 2026, SoFi secured the resignations of two more Citizens employees, Jones and Obermeier, and misappropriated a significant amount of Citizens' proprietary data when the Citizens employees assumed their positions at SoFi. *See* **Exhibit 46** and **Exhibit 47**.

89. Indeed, the day before his resignation, Obermeier sent a trove of Citizens' confidential client information and other proprietary information to his personal email. *See* **Exhibit 48**. The document contains ten separate spreadsheets. The first two sheets titled "Ryan Monthly" and "Ryan Weekly" contain Obermeier's performance regarding loans including his goals and actual performance as well as funding and application information. The "Ryan Weekly" identifies client names and loan information. The "Capital One Referrals," "DataBase," "Loans," "Pay Breakdown," "Possible Refinances," "Citizens Closed Loans," "Loan Referrals," and "Current Loan Status" sheets contain hundreds of entries for Citizens' clients that include client names, client addresses, phone numbers, emails, loan type, loan rates, loan status, loan location, loan terms, referral information, notes from contacting clients, and "possible refinances". The misappropriated documents included referrals for customers provided by Citizens' bankers. There was no legitimate business reason for Obermeier to steal this information from Citizens on the eve

of his departure. Upon information and belief, as a result of its encouragement and instruction, SoFi has misappropriated a significant amount of Citizens' confidential client information and proprietary data. Obermeier took Citizens' confidential and proprietary information with him to enable SoFi to steal Citizens' clients and compete unfairly against Citizens.

90. The evidence clearly indicates that the Former Employees breached their fiduciary duties to Citizens by removing Citizens' confidential client information and other proprietary information with the premeditated intent to use Citizens' proprietary information to steal Citizens' current and prospective business for the benefit of SoFi.

91. Days after SoFi's mass raid and removal of Citizens' confidential information, Citizens learned that Former Employee, Ordille, was induced by SoFi to breach his Agreement with Citizens. Ordille, a former manager for Citizens, induced a loan officer, Rubin, whom he had previously recruited to Citizens, to resign from Citizens and join SoFi on July 1, 2026. *See* **Exhibit 49**.

92. At the time of this filing, Citizens has learned that at SoFi's behest, Former Employee Obermeier induced another Citizens employee, Steven Abelman ("Abelman"), to resign from Citizens and join SoFi on July 16, 2026. *See* **Exhibit 50**. Abelman was the third Citizens employee SoFi poached from Citizens' Virginia offices in the past 30 days.[14] SoFi is clearly accelerating its massive unlawful raid of Citizens' mortgage department.

**H. Citizens suffers irreparable harm**

93. Citizens derives actual and potential economic value from its customer mortgage loan and financial information, because this information is not generally known to and not readily

[14] On or around July 7, 2023, Citizens hired Abelman as an Officer, Asset Mortgage Sales Manager of its home mortgage division in Virgina. Upon his hiring, Abelman signed an offer letter with Citizens. *See* **Exhibit 51**.

ascertainable through proper means by other persons who can obtain economic value from their disclosure or use.

94. By improperly inducing the Former Employees to solicit Citizens employees and Citizens' clients and absconding with Citizens' confidential and proprietary trade secrets, SoFi caused and will continue to cause irreparable injury to Citizens which cannot be cured by monetary damages alone. Among other things, SoFi's wrongdoing has caused and will continue to cause irreparable harm through (i) impairing Citizens' goodwill and reputation with its customers and referral sources, (ii) destroying Citizens' customer, referral, and employee relationships, (iii) disrupting the continuity of Citizens' workforce, (iv) threatening the continued disclosures, misuse, and misappropriation of Citizens' confidential and trade secret information, including legally protected consumer information; and (v) threatening to cause the destruction and total loss of Citizens' mortgage business in this state. SoFi presents a serious threat to Citizens' customers, key employees, and valuable confidential information and trade secrets and they must be stopped. Their unlawful efforts are underway, ongoing, and continuing.

95. It is critical that this Court grant permanent injunctive relief stopping SoFi from retaining and misusing Citizens' information and improperly diverting business from Citizens. If additional clients and employees are diverted away, Citizens will lose those relationships for years into the future and will face the destruction and total loss of its mortgage business in this state. The damages that flow from such an occurrence are huge and extremely difficult to quantify. So too is the negative impact and loss of goodwill, referral sources, confidentiality of client information, and office stability should SoFi remain unchecked.

## V. CAUSES OF ACTION

### A. COUNTS I and II – Misappropriation of Trade Secrets in violation of the Defend Trade Secrets Act – 18 U.S.C. § 1836 *et seq* and Misappropriation of Trade Secrets in violation of the Connecticut Uniform Trade Secrets Act

96. Citizens repeats and re-alleges the allegations contained in the preceding paragraphs as if set forth fully herein.

97. The Former Employees had full access to Citizens' client lists, client contact and financial information, proprietary investment strategies, and other confidential and/or proprietary information, all of which constitute trade secrets under the Defend Trade Secrets Act, 18 U.S.C. § 1836 *et seq* ("DTSA") and the Connecticut Uniform Trade Secrets Act ("CUTSA"), Conn. Gen. Stat. § 35-51. Specifically, the Former Employees had access to trade secret information maintained by Citizens regarding (i) its customers' identities and contact information; (ii) its clients' financial information and mortgage loan needs; (iii) its clients' mortgage information, product type, terms, and rates, (iv) sensitive customer information such as dates of birth and social security numbers shared for the purpose of obtaining mortgages, and (v) referral information with respect to mortgage customers, including information about their real estate agents. Because Citizens services customers in several states and provides mortgage products in interstate commerce, these trade secrets are related to products and services used in and intended for use in interstate commerce. Importantly, the information detailed *supra* and misappropriated by Defendant was used by Citizens in interstate commerce. Specifically, the clients whose information is at issue reside in multiple states and the employees in Citizens' offices used the misappropriated information to service clients across state lines. Additionally, that same information is now being used improperly by SoFi and SoFi's employees across multiple states and is being used improperly to develop business across multiple states.

98. Under the DTSA and CUTSA, trade secrets include all forms and types of financial information, business, technical, and economic information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorized physically, electronically, graphically, photographically, or in writing. 18 U.S.C. § 1839(3); Conn. Gen. Stat.§ 35-51. Citizens' customer lists, client contact and mortgage information, client demographic information including their social security numbers and dates of birth, proprietary mortgage strategies, clients' referral information including their real estate agents and other confidential and/or proprietary information fall squarely within the DTSA's definition of a trade secret.

99. Citizens' trade secrets and confidential and/or proprietary information derive independent economic value, actual and potential, from not being generally known to and/or readily ascertainable through proper means by other persons who could obtain economic value from the disclosure or use of such information. Citizens expends significant resources to obtain and protect these trade secrets, and Citizens is entitled to rely upon its ability to protect those trade secrets from disclosure to or use by a competitor. Furthermore, Citizens is the entity in which rightful legal or equitable title to, or license in, the trade secrets is reposed.

100. In fact, Citizens took active steps, which were reasonable under the circumstances, to maintain the secrecy of this confidential, proprietary, and/or trade secret information. Generally, to protect itself from unfair competition, Citizens makes substantial efforts to ensure the confidentiality of information concerning its clients and strategies. In addition to the contractual safeguards set forth in the Agreements, Citizens implements policies and other security measures described above, which were incorporated into the Agreements.

101. SoFi has acquired Citizens' trade secrets through the Former Employees and has been using them without express or implied consent. As a competitor in the mortgage services industry, SoFi is keenly aware of the protections afforded to client information and other trade secret information. Moreover, SoFi is aware that the Former Employees could only have brought this information with them through improper means.

102. SoFi's misappropriation and use of Citizens' trade secrets and confidential and/or proprietary information as described herein was intentional, willful, and/or carried out with malice and intent to injure Citizens as its business.

103. As a direct and proximate result of SoFi's misappropriation of Citizens' trade secrets, Citizens has suffered irreparable harm, has no adequate remedy at law, and is entitled to permanent injunctive relief and to actual, consequential punitive damages in an amount to be determined at trial.

**B. COUNT III – Violation of Civil RICO**

104. Citizens repeats and re-alleges the allegations contained in the preceding paragraphs as if set forth fully herein.

105. Pursuant to 18 U.S.C. § 1964(c), RICO provides a private right of action for treble damages to "[a]ny person injured in his business or property by reason of a violation of section 1962."

106. Pursuant to 18 U.S.C. § 1962(c), RICO makes it "unlawful for any person employed by or associated with a RICO "enterprise" "to conduct or participate […] in the conduct of such enterprise's affairs through a pattern of racketeering activity." Pursuant to 18 U.S.C. § 1962(d), RICO also makes it "unlawful for any person to conspire to violate […] subsection […] (c) of this section.

107. SoFi and its co-conspirators' illegal scheme directed at Citizens was conducted through a RICO enterprise and a pattern of racketeering activity, in violation of 18 U.S.C. §§ 1832, 1962(c), and 1962(d).

108. Pursuant to 18 U.S.C. §1961(4), SoFi and the Former Employees are a RICO enterprise because they are associated in fact for the common purpose of misappropriating Citizens' trade secret information. This enterprise is engaged in interstate commerce as demonstrated by, among other things, the coordinated activities detailed above carried out across multiple states, including its efforts to steal Citizens' trade secrets and use those trade secrets for its financial benefit and to the financial detriment of Citizens.

109. SoFi is associated with this RICO enterprise because it is the entity which hired the Former Employees and facilitated their theft of trade secrets. SoFi was involved in and directed the scheme undertaken through the enterprise to steal, for the financial benefit of the enterprise (and, by extension, SoFi), its competitors' trade secrets by poaching key employees with knowledge of, and experience with, those trade secrets.

110. Pursuant to 18 U.S.C. § 1961(1) and (5), SoFi and its co-conspirators participated in the RICO enterprise through a "pattern of racketeering activity."

111. Pursuant to 18 U.S.C. § 1961(1)(B), "racketeering activity" includes "any act which is indictable under [… 18 U.S.C.] sections 1831 and 1832 (relating to economic espionage and theft of trade secrets) […]."

112. As set forth above, SoFi and the Former Employees engaged in intentional theft and misappropriation of Citizens' trade secrets in violation of the DTSA.

113. Pursuant to 18 U.S.C. § 1961(5), a "pattern of racketeering activity" means "at least two acts of racketeering, one of which occurred after the effective date of this chapter and the last

of which occurred within ten years […] after the commission of a prior act of racketeering activity."

114. SoFi and its co-conspirators, the Former Employees, knowingly participated in the commission of multiple acts of racketeering in connection with the theft of trade secrets from Citizens. All of those acts occurred since the enactment of the RICO statute and within ten years of each other.

115. In particular, SoFi's pattern of racketeering activity is demonstrated by its knowing involvement in the enterprise's efforts to obtain and use without authorization Citizens' trade secrets.

116. Citizens has suffered and will continue to suffer financial injuries as a result of SoFi's and its co-conspirators' efforts to steal its business, property, and profits, entitled Citizens to relief pursuant to 18 U.S.C. §§ 1964(a) and (c).

**C. COUNT IV – Tortious Interference with Contract**

117. Citizens repeats and re-alleges the allegations contained in the preceding paragraphs as if set forth fully herein.

118. Citizens is a party to valid employment agreements with the Former Employees.

119. Upon information and belief, SoFi was aware of the Agreements from times preceding the breaches thereof.

120. SoFi permitted and/or encouraged the breaches of the Agreements including the breaches of their non-solicitation clauses and confidentiality provisions and intentionally and without justification induced the breaches with malicious intent, through improper means, and for an improper purpose. Indeed, as discussed *supra*, the Former Employees repeatedly misappropriated Citizens' confidential and proprietary information and solicited other employees to leave their employment with Citizens and work for SoFi.

121. SoFi's actions have been carried out with reckless indifference to Citizens' rights, and/or constitute an intentional and wanton violation of those rights.

122. As a direct and proximate result of SoFi's tortious interference with the Former Employees' Agreements, Citizens has suffered irreparable harm, has no adequate remedy at law, and is entitled to permanent injunctive relief and to actual, consequential, and punitive damages in an amount to be determined at trial.

### D. COUNT V – Tortious Interference with Business Relationships and Prospective Contractual Relations

123. Citizens repeats and re-alleges the allegations contained in the preceding paragraphs as if set forth fully herein.

124. Citizens has developed and maintained, and continues to develop and maintain, contractual and prospective relationships with customers, as well as with prospective customers, of whom the Former Employees were aware in their capacity as Citizens employees in the course of their employment with Citizens. Citizens has a reasonable expectation of continuing these business relationships with these customers and entering into new valid contractual relationships with these customers. SoFi had knowledge of these business relationships but improperly and intentionally interfered with them by inducing the Former Employees to breach their contractual obligations with Citizens and improperly contact and solicit these Citizens' customers through the use of Citizens' confidential information. SoFi's conduct has threatened the destruction and total loss of Citizens' mortgage business in this state.

125. SoFi's conduct caused Citizens employees, including the Former Employees, and customers to disrupt their business relationships and/or expectancies with Citizens.

126. SoFi's actions have been carried out with reckless indifference to Citizens' rights, and/or constitute an intentional and wanton violation of those rights.

127. As a direct and proximate result of SoFi's tortious interference, Citizens has suffered irreparable harm, has no adequate remedy at law, and is entitled to permanent injunctive relief and to actual, consequential, and punitive damages in an amount to be determined at trial.

**E. COUNT VI – Aiding and Abetting Breach of Duty of Loyalty and Fiduciary Duty**

128. Citizens repeats and re-alleges the allegations contained in the preceding paragraphs as if set forth fully herein.

129. The Former Employees owed Citizens a duty of loyalty and fiduciary duties during the terms of their employments with Citizens, which they breached by engaging in the conduct alleged above and incorporated herein. As a result of the Former Employees' breaches of their duty of loyalty and fiduciary duty, Citizens has sustained and will continue to sustain irreparable injury.

130. By inducing the Former Employees to breach their fiduciary duties and their duties of loyalty as described above, SoFi aided and abetted the Former Employees in their breaches.

131. There was no privilege or justification for SoFi's or the Former Employees' conduct.

132. SoFi's conduct, as set forth and incorporated herein, has been willful and malicious. Moreover, SoFi's actions have been carried out with reckless indifference to Citizens' rights, and/or constitute an intentional and wanton violation of those rights.

133. As a direct and proximate result of SoFi's aiding and abetting of the Former Employees' breach of their fiduciary duties, Citizens has suffered irreparable harm, has no adequate remedy at law, and is entitled to permanent injunctive relief and to actual, consequential, and punitive damages in an amount to be determined at trial.

**F. COUNT VII – Unjust Enrichment**

134. Citizens repeats and re-alleges the allegations contained in the preceding paragraphs as if set forth fully herein.

135. By inducing the Former Employees to take, transfer, disclose, and use Citizens' confidential and proprietary information, materials, and trade secrets without authorization for SoFi's own use and benefit, SoFi has unjustly enriched itself at Citizens' expense.

136. Through the Former Employees and their former affiliation with Citizens, Citizens conferred benefits on SoFi in the form of client relationships and confidential information. SoFi was aware of these benefits and retained financial benefits and benefits from confidential information and client relationships under circumstances where it would be unjust to retain the same without payment. To wit, SoFi continues to leverage Citizens' customer relationships and confidential information following the resignation of the Former Employees to directly compete with Citizens.

137. Under the circumstances as alleged above, it would be inequitable for SoFi to retain the benefits of its outrageous actions.

138. SoFi's actions have been carried out with reckless indifference to Citizens' rights, and/or constitute an intentional and wanton violation of those rights.

139. As a direct and proximate result of SoFi's unjust enrichment of Citizens' client relationships and confidential information through the Former Employees, Citizens has suffered irreparable harm, has no adequate remedy at law, and is entitled to permanent injunctive relief and to actual, consequential, and punitive damages in an amount to be determined at trial.

**G. COUNT VIII – Unfair Competition**

140. Citizens repeats and re-alleges the allegations contained in the preceding paragraphs as if set forth fully herein.

141. SoFi has been and continues to engage in predatory hiring practices in unfair competition with Citizens by inducing the Former Employees to breach their employment agreements, aiding and abetting the Former Employees in breaching their fiduciary duties, tortiously interfering with business relationships and expectancies, and by engaging in other anti-competitive behavior.

142. SoFi's actions have been carried out with reckless indifference to Citizens' rights, and/or constitute an intentional and wanton violation of those rights.

143. As a direct and proximate result of unfair competition, Citizens has suffered irreparable harm, has no adequate remedy at law, and is entitled to permanent injunctive relief and to actual, consequential, and punitive damages in an amount to be determined at trial.

**H. COUNT IX – Civil Conspiracy**

144. Citizens repeats and re-alleges the allegations contained in the preceding paragraphs as if set forth fully herein.

145. The actions described above, conducted by SoFi and the Former Employees, demonstrate an express agreement, understanding, or design between them to, among other things, breach their Agreements, misappropriate trade secrets, tortiously interfere with contracts, tortiously interfere with business relationships and prospective contractual relations, and unfairly compete with Citizens.

146. SoFi's actions have been carried out with reckless indifference to Citizens' rights, and/or constitute an intentional and wanton violation of those rights.

147. As a direct and proximate result of civil conspiracy, Citizens has suffered irreparable harm, has no adequate remedy at law, and is entitled to permanent injunctive relief and to actual, consequential, and punitive damages in an amount to be determined at trial.

## I. COUNT X – Unfair Trade Practices in violation of the Connecticut Unfair Trade Practices Act - Conn. Gen. Stat.§ 42-110a, et seq.

148. Citizens repeats and re-alleges the allegations contained in the preceding paragraphs as if set forth fully herein.

149. SoFi is a "person" within the meaning of Conn. Gen. Stat. § 42-110a.

150. SoFi has engaged in deceptive and unfair trade practices as set forth above, including coordinated talent poaching, working with high level Citizens employees and former employees to coordinate same, theft of trade secrets and confidential information, and inducing entire teams to simultaneously resign and breach restrictive covenants. These violations have damaged Citizens' reputation in Connecticut, damaged Citizens' market position in Connecticut, threatened the destruction and total loss of Citizens' mortgage business in this state, and interfered with established business relationships.

151. SoFi and Citizens are both engaged in the conduct of trade and commerce in Connecticut, in that they are engaged in the advertising, offering, and/or distribution of services and things of value in this state, including mortgage lending and other financial services. SoFi's malfeasance described in the pleading occurred in the conduct of that trade and commerce.

152. Moreover, SoFi's deceptive and unfair trade practices amount to a violation of Connecticut public policy protecting (i) the viability of businesses and fair competition in Connecticut; (ii) confidentiality of information, including customer financial information and company trade secrets; (iii) Citizens' contractual rights. SoFi's conduct has been unfair, unethical, immoral, oppressive, unscrupulous, dishonest and violative of public policy in violation of Conn. Gen. Stat. §§ 42-110, *et seq.*, including encouraging and inducing Citizens employees to breach their contractual obligations and steal trade secrets. And, as set forth above, SoFi's conduct has caused substantial injury to Citizens, a competitor, in the form of hundreds of millions in lost

business expectancies, loss of trade secret and confidential information, and devastation of business units in entire geographic areas.

153. Citizens has suffered ascertainable loss of money and property as a result of SoFi's unfair trade practices and is thus entitled to recover actual damages in an amount to be proven at trial. And, as authorized by statute, Citizens is entitled to punitive damages, other equitable relief, and attorneys' fees as this Court deems necessary and proper.

154. Citizens has mailed a copy of the instant Complaint to the Attorney General and the Commissioner of Consumer Protection in accordance with Conn. Gen. Stat. § 42-110g(c).

## VI. PUNITIVE DAMAGES, TREBLE DAMAGES, AND ATTORNEYS' FEES

155. SoFi's actions have been carried out with reckless indifference to Citizens' rights, and/or constitute an intentional and wanton violation of those rights. Accordingly, under Connecticut law, Citizens seeks and is entitled to an award of punitive damages against SoFi on its tort claims, including reasonable and necessary attorneys' fees.

156. SoFi willfully and maliciously misappropriated Citizens' trade secrets. Accordingly, Citizens seeks and is entitled to punitive damages in an amount not exceeding twice any award made on its trade secret claims. Conn. Gen. Stat. § 35-53(b); 18 U.S.C. § 1836(b)(3)(C), (D). Citizens also seeks and is entitled to its reasonable attorneys' fees. *Id.*

157. Citizens has suffered ascertainable loss as a result of SoFi's unfair trade practices. Accordingly, under Connecticut law, Citizens seeks and is entitled to punitive damages, costs, and reasonable attorneys' fees based on the work reasonably performed. Conn. Gen. Stat.§ 42-110g(a), (d).

158. Citizens has been injured in its business or property by reason of a violation of 18 U.S.C. § 1962 and is thus entitled to recover treble damages and costs of suit, including reasonable attorneys' fees. 18 U.S.C. § 1964(c).

## VII. PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully prays that this Court:

i. Find in favor of Citizens on all Counts contained in the Original Complaint.

ii. Enter a permanent injunction against SoFi providing that:

a. SoFi is enjoined and restrained, directly or indirectly, and whether alone or in concert with others, including but not limited to the Former Employees, from:

i. Facilitating Citizens employees' breaches of their contracts with Citizens including the solicitation of Citizens employees and customers whose name became known to SoFi as a direct or indirect result of the Former Employees employment with Citizens;

ii. Tortiously interfering with Citizens' contractual relationships and current and prospective business relationships;

iii. Further acts of unfair competition including targeted hiring of Citizens' employees; and

iv. Directly or indirectly, using, divulging, disclosing, or communicating any trade secrets or confidential or proprietary information learned by SoFi through the Former Employees in connection with their employment with Citizens. Trade secrets shall mean any information which is not generally known or publicly available outside of Citizens concerning any matters relating to the affairs or business of Citizens, including, without limiting the generality of the foregoing, information concerning Citizens customers' borrowing and mortgage loans, or any other information concerning the business of Citizens including, but not limited to, their manner of operation, their business plans and/or strategies, or other data.

b. SoFi, and all those acting in concert with it, are required to return to Citizens or its counsel all records, documents and/or information in whatever form pertaining to Citizens' clients, employees and business within 24 hours of notice to SoFi or its counsel of the terms of such an order, and SoFi is required to permanently destroy all copies of such records, documents and/or information.

iii. Award compensatory damages, including consequential damages and exemplary damages, in an amount to be proven at trial;

iv. Award punitive, treble, and exemplary damages;

v. Award reasonable attorneys' fees and costs;

vi. Award interest; and

vii. Award such other and further relief, both general and special, at law or in equity, to which Citizens is justly entitled.

Dated this 9th day of September, 2026.

Respectfully submitted,

**COHEN AND WOLF, P.C.**

By: /s/ *David A. Ball*
David A. Ball, Esq. (ct10154)
Wilson T. Carroll, Esq. (ct31306)
1115 Broad Street
Bridgeport, CT 06604
Phone: 203-368-0211
Fax: 203-337-5534
Email: dball@cohenandwolf.com
Email: wcarroll@cohenandwolf.com

**-AND-**

**HENNEMAN RAU & KIRKLIN LLP**

By: /s/ *Matthew B. Henneman*
Matthew B. Henneman
Texas State Bar No. 00790865
Federal ID No. 21661
**Application for Pro Hac Vice Admission Forthcoming*
Erin Friel Elmore
Texas State Bar No. 24027258
Federal ID No. 430907
**Application for Pro Hac Vice Admission Forthcoming*
Joseph A. Cialone III
Texas State Bar No. 24100153
Federal ID No. 3026951

*Application for Pro Hac Vice Admission Forthcoming
815 Walker Street, Suite 1440
Houston, Texas 77002
Phone: 713-955-6030
Fax: 713-955-6141
Email: mhenneman@hrklaw.com
Email: efelmore@hrklaw.com
Email: jcialone@hrklaw.com

**ATTORNEYS FOR PLAINTIFF CITIZENS BANK, N.A.**